### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| L2 MOBILE TECHNOLOGIES LLC, | Civil Action No. 2:25-cv-00705 |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| PACCAR INC., | |
| Defendant. | |

### COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff L2 Mobile Technologies LLC ("L2MT") complains against Defendant PACCAR Inc. ("PACCAR") as follows:

### NATURE OF ACTION

1.      This is an action for patent infringement of United States Patent Nos. 8,321,740 and 8,392,784 (collectively, the "Patents in Suit") under the Patent Laws of the United States, 35 U.S.C. § 1, *et seq.*

### THE PARTIES

2.      Plaintiff L2MT is a corporation organized and existing under the laws of the State of Texas with its principal place of business at 8105 Rasor Blvd., Suite 210, Plano, TX 75024. L2MT is in the business of licensing patented technology. L2MT is the assignee of the Patents in Suit.

3.      Defendant PACCAR is a corporation organized under the laws of the State of Delaware, with a regular and established place of business at 1700 Woodbrook Street, Denton, TX 76205, which is the headquarters of Peterbilt Motors Company, a division of PACCAR. PACCAR

directly and/or through one or more of its subsidiaries, affiliates, and/or intermediaries conducts business in and is doing business in Texas and this District and elsewhere in the United States, including, without limitation, making, using, offering to sell, selling, and/or importing connected vehicles containing integrated wireless communications devices that embody the patented technology, and enabling end-user purchasers to use such connected vehicles in this District. The wireless communications devices in PACCAR's connected vehicles comply with the LTE wireless communications standard.

4.     Upon information and belief, Peterbilt Motors Company is an unincorporated division of PACCAR, with a place of business in this Judicial District located at 1700 Woodbrook Street, Denton, TX 76205. Peterbilt also maintains a manufacturing facility in this Judicial District at 3200 Airport Road, Denton, TX 76207. Upon information and belief, Peterbilt sells and offers to sell products and services throughout the United States, including in this Judicial District.

5.     Upon information and belief, Kenworth is an unincorporated division of PACCAR, with a place of business at 10630 N.E. 38th Place, Kirkland, WA 98033. Upon information and belief, Kenworth sells and offers to sell products and services throughout the United States, including in this Judicial District.

6.     Upon information and belief, PACCAR manages the marketing, sales and service of medium and heavy-duty trucks marketed under the Peterbilt and Kenworth nameplates to customers and/or potential customers located in Texas and in the Judicial District. Upon information and belief, each dealer permitted to sell and service new medium and heavy-duty trucks marketed under the Kenworth and Peterbilt nameplates in this Judicial District must be authorized by PACCAR.

## JURISDICTION

7.     Certain claims in this action arise under the patent laws of the United States. Accordingly, this Court has subject matter jurisdiction over the patent claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

8.     Defendant PACCAR is subject to this Court's specific and general personal jurisdiction pursuant to due process and the Texas Long Arm Statute, due at least to its substantial business conducted in this forum, directly and/or through intermediaries, including having (i) solicited business in the State of Texas, transacted business within the State of Texas, and attempted to derive financial benefit from residents of the State of Texas, including benefits directly related to the instant patent infringement causes of action set forth herein; (ii) placed its vehicles into the stream of commerce throughout the United States and transacted business in Texas and in this District; and (iii) either alone or in conjunction with others committed acts of infringement within this District and induced others to commit acts of infringement within this District. On information and belief, Defendant, directly and/or through intermediaries, has advertised (including through websites), offered to sell, sold, and/or distributed infringing vehicles, and/or has induced the sale and use of infringing products in Texas. Defendant has, directly or through its distribution network, purposefully and voluntarily placed such vehicles in the stream of commerce knowing and expecting them to be purchased and used by consumers in Texas and in this District.

9.     Further, on information and belief, PACCAR is subject to the Court's general jurisdiction, including from regularly doing or soliciting business, engaging in other persistent courses of conduct, and/or deriving substantial revenue from goods and services provided to individuals in Texas and in this District. Therefore, the exercise of jurisdiction over PACCAR is

appropriate under the applicable jurisdictional statutes and would not offend traditional notions of fair play and substantial justice.

10.     On information and belief, PACCAR does one or more of the following with vehicles that use the LTE wireless communication standards and that embody the patented technology: (a) manufacture (directly or through third party manufacturers) and/or assemble these vehicles that are and have been used, offered for sale, sold, and purchased in this District; (b) use these vehicles in this District; (c) import these vehicles into the United States for sale to consumers, including consumers in this District; and (d) sell these vehicles or offer them for sale (directly or through third party distributors) in the United States, including to customers in this District.

## VENUE

11.     Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400.

12.     PACCAR is subject to personal jurisdiction in this District, has at least one regular and established place of business in this District, is registered to do business in Texas, and has committed acts of infringement within this District. Without limitation, on information and belief, within this District Defendant, directly and/or through intermediaries, has made, advertised (including through websites), offered to sell, sold and/or distributed infringing vehicles, and/or have induced the sale and use of infringing vehicles.

13.     PACCAR, directly and through subsidiaries or intermediaries (including distributors, retailers, and others), has purposefully and voluntarily placed its infringing vehicles and services into this District and into the stream of commerce with the intention and expectation that they will be purchased and used as designed by consumers in this District. PACCAR has offered and sold and continues to offer and sell these infringing vehicles and services in this District, including at physical locations within this District.

14.   PACCAR has committed acts of infringement in this Judicial District and has a regular and established place of business in this Judicial District.

15.   PACCAR occupies at least one permanent, physical place within this District from which PACCAR carries out its business at Peterbilt Motors Co. at 1700 Woodbrook Street, Denton, TX 76205. Upon information and belief, PACCAR engages in sales and service of products that infringe the patents-in-suit at numerous vehicle dealerships within this District, including Rush Peterbilt Truck Center at 6975 South Major Road, Beaumont, TX 77705, Rush Peterbilt Truck Center at 3901 North Medford Drive, Lufkin, TX 75901, Rush Peterbilt Truck Center at 1931 North King's Highway, Nash, TX 75569, MHC Kenworth at 5565 East Loop 281 South, Longview, TX 75602, MHC Kenworth at North Masch Brand Road, Building 1, Denton, TX 76207, Performance Truck at 1287 Highway 59 North, Cleveland, TX 77328, Performance Truck at 2501 N. Medford Drive, Lufkin, TX 75901, and MHC Kenworth at 912 East Loop Drive, Texarkana, TX 75501.. On further information and belief, PACCAR's Peterbilt division operates a facility in this Judicial District at 3200 Airport Road, Denton, TX 76207 where infringing vehicles are manufactured.

16.   As another example of permanent, physical places within this District from which PACCAR carries out its business, upon information and belief employees of PACCAR regularly travel to the Dealers in this Judicial District to provide support and exercise control over the sales, marketing, and service of medium and heavy-duty trucks marketed under the Peterbilt and Kenworth nameplates in this Judicial District. As examples of PACCAR's support to and control over the Dealers, upon information and belief, PACCAR's employees travel to the Dealers located in this Judicial District to ensure compliance with PACCAR's Dealer standards, ensure that advertising is consistent with PACCAR's corporate message and branding guidelines, train

dealership personnel on new products, assist Dealers with problem solving, diagnose technical concerns, provide on-site assistance, assist Dealers with sales, marketing, business development and business plans, ensure Dealer orders meet market demand, manage monthly vehicle allocation, and review and analyze Dealer financial statements and consult with Dealers to improve their operations and retail business..

17.    As a further example of permanent physical places within this District from which PACCAR carries out its business, through its exclusive agents, instrumentalities, and representatives, PACCAR provides new vehicle warranty service within this Judicial District on the infringing products. Upon information and belief, PACCAR warrants to the original and each subsequent owner of new medium and heavy-duty trucks marketed under the Kenworth and Peterbilt nameplates that any Authorized Dealer will make any repairs or replacements necessary to correct defects in material or workmanship arising during the warranty period. Upon information and belief, all such warranty work is paid for by PACCAR. Upon information and belief, the Peterbilt and Kenworth dealerships located within this Judicial District are Defendant's exclusive agents, instrumentalities, and representatives within this Judicial District. Upon information and belief, if a customer of PACCAR located within this Judicial District needs to have new vehicle warranty repairs performed within the District, PACCAR offers the customer to have the work performed at one of their authorized Dealers within the District.

## THE PATENTS IN SUIT

18.    On November 27, 2012, U.S. Patent No. 8,321,740 ("the '740 patent"), entitled "METHOD AND APPARATUS OF HANDLING TTI BUNDLING," a copy of which is attached hereto as Exhibit 1, was duly and legally issued. The '740 patent issued from U.S. Patent Application Serial Number 12/538,876, filed August 11, 2009, which claims priority to U.S. Provisional Patent Application No. 61/089,056, filed August 15, 2008. An ex parte reexamination

certificate issued for the '740 patent on October 12, 2023 and is included in Exhibit 1. The '740 patent discloses and relates to wireless communication protocols. The inventors assigned all right, title, and interest in and to the '740 patent to ASUSTeK Computer, Inc. (hereinafter "ASUSTeK"). ASUSTeK assigned its entire right, title, and interest in and to the '740 patent to Innovative Sonic Ltd. ("ISL"). ISL assigned its entire right, title, and interest in and to the '740 to L2MT. L2MT is the current and sole owner of all rights, title and interest in and to the '740 patent, including the right to sue for and collect past, present and future damages and to seek and obtain injunctive or any other relief for infringement of the '740 patent. PACCAR had actual notice of the '740 patent no later than October 6, 2020.

19.    On March 5, 2013, U.S. Patent No. 8,392,784 ("the '784 patent"), entitled "METHOD AND APPARATUS OF HANDLING TTI BUNDLING RETRANSMISSION," a copy of which is attached hereto as Exhibit 2, was duly and legally issued. The '784 patent issued from U.S. Patent Application Serial Number 12/541,164, filed August 14, 2009, which claims priority to U.S. Provisional Patent Application No. 61/089,056, filed August 15, 2008. The '784 patent discloses and relates to wireless communication protocols. The inventor assigned all right, title, and interest in and to the '784 patent to ASUSTeK. ASUSTeK assigned its entire right, title, and interest in and to the '784 patent to ISL. ISL assigned its entire right, title, and interest in and to the '784 to L2MT. L2MT is the current and sole owner of all rights, title and interest in and to the '784 patent, including the right to sue for and collect past, present and future damages and to seek and obtain injunctive or any other relief for infringement of the '784 patent. PACCAR had actual notice of the '784 patent no later than January 2022.

## BACKGROUND

20.    The 3rd Generation Partnership Project ("3GPP") develops standards for globally-applicable mobile communications systems. Originally established in 1998 to produce technical

specifications and technical reports for a 3G mobile system, the scope of 3GPP has since expanded. For example, it has since taken on the responsibility of developing LTE and 5G cellular technologies. 3GPP has become the focal point of the vast majority of mobile systems beyond 3G.[1]

21.    3GPP unites seven telecommunications standards development organizations from around the world known as "Organizational Partners." These Organizational Partners include the European Telecommunications Standards Institute ("ETSI") as well as the Alliance for Telecommunication Industry Solutions, USA, and several others. Companies may participate in 3GPP through their membership in one of the Organizational Partners.

22.    ETSI is an independent, non-profit Organizational Partner that produces globally-accepted standards for the telecommunication industry. ETSI currently has more than 900 members from more than sixty countries across five continents. ETSI is the recognized regional standards body dealing with telecommunications, broadcasting and other electronic communications networks and services. ETSI was initially founded to serve European standards setting needs, but ETSI's standards are now used worldwide. ETSI and its members have developed global standards that ensure worldwide state-of-the-art performance and interoperability between networks, devices, and network operators for a number of services and applications.

23.    The LTE wireless communications standard establishes precise specifications for the essential components of telecommunications systems and are central to allowing products and services from unrelated competitors to be compatible and operate seamlessly with a

---

[1] https://www.3gpp.org/about-3gpp (last visited February 9, 2025).

telecommunications network. Global standards enable any company to market and sell mobile devices and provide for ubiquitous connectivity for users across telecommunications networks. Consumers benefit from a ubiquitous network that works across multiple wireless service provider platforms. Consumers also can pick from a wide variety of devices because the standards are available for any manufacturer wanting to implement the standards into their smartphones and other devices.

24.    Developing wireless communications standards is an iterative process. Industry members who develop mobile communications technology compete to find solutions to the standard's technical challenges and goals. The member companies participate in 3GPP Working Groups to discuss and select, through a voting process, the most acceptable technology among competing proposals. Technologies developed by individual members that are proposed to the 3GPP Working Groups often become part of the 3GPP standards.

25.    The LTE wireless standards have contributed to the growth in the cellular industry, providing affordable communication to billions of people worldwide. According to the U.S. Department of Justice and U.S. Patent Office:

> Standards, particularly voluntary consensus standards set by standards developing organizations (SDOs), play a vital role in the economy. SDOs develop standards using open, transparent, and consensus-based processes to address issues of interest to their stakeholders. By allowing products designed and manufactured by many different firms to function together, interoperability standards can create enormous

value for consumers and fuel the creation and utilization of new and innovative technologies to benefit consumers.[2]

26.    3GPP participants are required to abide by the intellectual property rights ("IPR") policy of the Organizational Partners to which they belong. These IPR policies, such as the ETSI IPR Policy, are intended to strike "a balance between the needs of standardization for public use in the field of telecommunications and the rights of the owners of IPRs."[3] "IPR holders, whether members of ETSI and their AFFILIATES or third parties, should be adequately and fairly rewarded for the use of their IPRs in the implementation of STANDARDS and TECHNICAL SPECIFICATIONS."[4]

27.    3GPP participants are required to disclose intellectual property (including patents and patent applications) owned by them which they believe are or are likely to become essential, or might be essential, to any 3GPP standard, including LTE. Companies are also required by IPR policies to license their intellectual property on terms and conditions that are fair, reasonable, and non-discriminatory ("FRAND").[5] These policies bind all successors-in-interest to license essential intellectual property on FRAND terms.[6]

---

[2] U.S. Department of Justice and U.S. Patent & Trademark Office, Policy Statement on Remedies for Standard-Essential Patents Subject to Voluntary F/RAND Commitments at 2, available at https://www.justice.gov/atr/page/file/1228016/download. (last visited February 9, 2025).

[3] ETSI Rules of Procedure, Annex 6: ETSI Intellectual Property Rights Policy § 3.1 (2022), available at http://www.etsi.org/images/files/IPR/etsi-ipr-policy.pdf (last visited February 9, 2025).

[4] Id. § 3.2.

[5] Id. § 6.1.

[6] Id. § 6.1.

28.     The ETSI IPR Policy is governed by French law.[7]

29.     Clause 15.6 of the ETSI IPR Policy defines the term "ESSENTIAL" to mean that "it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR." The ETSI Guide on IPRs further states "an 'essential IPR' is an IPR which has been included within a standard and where it would be impossible to implement the standard without making use of this IPR. The only way to avoid the violation of this IPR in respect of the implementation of the standard is therefore to request a license from the owner."[8]

30.     ETSI is and has been involved in standardization of the most recent generations of mobile communications standards, including the LTE wireless communications standards.

## L2MT'S STANDARD-ESSENTIAL PATENTS

31.     The Patents in Suit are among over 70 standard-essential patents owned by L2MT. The Patents in Suit were originally invented by, procured by, or assigned to ASUSTeK. ASUSTeK is or has been a member of the European Telecommunications Standards Institute ("ETSI"). ASUSTeK was a key contributor of proposals to the 3G wireless standard.

32.     ASUSTeK declared before ETSI the Patents in Suit as essential to the 3G wireless communication standard. As discussed above, the 3G and LTE wireless communication standards were developed or completed by ETSI.

---

[7] ETSI Rules of Procedure, Annex 6: ETSI IPR Policy, 29-30 November 2022, available at http://www.etsi.org/images/files/IPR/etsi-ipr-policy.pdf (last visited February 9, 2025).

[8] ETSI Guide on IPR, 19 September 2013, Version adopted by Board #94, available at http://www.etsi.org/images/files/IPR/etsi-guide-on-ipr.pdf (last visited February 9, 2025).

33.    L2MT became the owner of the Patents in Suit on or around January 5, 2017, obtaining all right, title, and interest in, to, and under the Patents in Suit, including without limitation all legal rights of the prior owners ISL and ASUSTeK, including exclusive enforcement rights.

34.    L2MT, as the present owner of the Patents in Suit, has voluntarily agreed to grant licenses under FRAND terms to willing licensees who negotiate in good faith.

35.    ETSI's IPR Policy Section 3.2 states that IPR holders are to be adequately and fairly rewarded for use of their IPRs in the implementation of standards and technical specifications. A true and correct copy of ETSI's IPR Policy is attached hereto as Exhibit 3.

36.    Consistent with its FRAND commitment, L2MT, since taking ownership of the Patents in Suit, has thus far licensed them to nine members of the telecommunications industry who have agreed to pay royalties to L2MT for a global portfolio license on FRAND terms.

37.    The ubiquity and proliferation of wireless communications implemented in connected devices, such as PACCAR's vehicles, is based on the development of the LTE wireless communication standards. Without LTE technology and L2MT's inventions incorporated therein, PACCAR's vehicles would not have the connectivity that provides user access to features that require data streaming, such as navigation, live traffic visualization, satellite view maps, video streaming, music streaming, and internet browsing. PACCAR's implementation of LTE mobile communications in its vehicles, and the features allowed by such connectivity, are dependent on the performance that L2MT's inventions provide.

**PLAINTIFF'S ATTEMPTS TO LICENSE PACCAR**

38.    L2MT is a member of the Avanci LLC patent pool. On information and belief, Avanci LLC made PACCAR a FRAND offer to patents that are essential to the LTE wireless

communications standard, including the Patents in Suit. On information and belief, PACCAR declined to take a license to the Patents in Suit through Avanci despite Avanci's license proposals.

## PACCAR'S INFRINGING PRODUCTS AND METHODS

39.    PACCAR makes, uses, sells, offers for sale and/or imports into the United States connected vehicles that comply with the LTE wireless communications standard. Each of the Patents in Suit is essential to the LTE wireless communications standard. PACCAR's vehicles that comply with the LTE wireless communications standard cannot operate without implementing the designs and methods claimed in the Patents in Suit.

40.    By way of example, and without limitation, upon information and belief, PACCAR's vehicles that comply with the LTE wireless communications standards include the Peterbilt Models 535, 536, 537, 548, the Kenworth Models L770, T180, T280, T380, T480, K270E, K370E, and all PACCAR vehicles that utilize any of PACCAR's Truck Connectivity Services, including TRUCKTECH+, SMARTLINQ, PACCAR Solutions, PACCAR Connect, and Remote Diagnostics (the "PACCAR Standard-Compliant Vehicles"). The operator manuals for these vehicles denote the TCU unit used in the vehicle and/or include a "Telematics" section highlighting the dependency of the vehicle on cellular data transmission.[9] Despite not having a license to the L2MT Essential Patents, including the Patents in Suit, the PACCAR Standard-Compliant Vehicles have used the methods and designs claimed therein. See the table below for a representative listing of PACCAR Standard-Compliant Vehicles and Model Years:

---

[9] https://www.kenworth.com/resources/manuals/; and https://www.peterbilt.com/resources/ (both last visited June 24, 2025).

| PACCAR Vehicle Model | Model Year(s) |
|---|---|
| Peterbilt 535 | 2021-Present |
| Peterbilt 536 | 2021-Present |
| Peterbilt 537 | 2021-Present |
| Peterbilt 538 | 2021-Present |
| Kenworth L770 | 2025-Present |
| Kenworth T180 | 2021-Present |
| Kenworth T280 | 2021-Present |
| Kenworth T380 | 2021-Present |
| Kenworth T480 | 2021-Present |
| Vehicles with TRUCKTECH+ | 2015-Present |
| Vehicles with SMARTLINQ | 2015-Present |
| Vehicles with PACCAR Solutions | 2022-Present |
| Vehicles with PACCAR Connect | 2024-Present |

41. On information and belief, the PACCAR Standard-Compliant Vehicles include LTE-compliant baseband processors, RF transceivers, antennas, RF power amplifiers, user graphical interfaces, and other software and hardware. All of these components combine together to enable the PACCAR Standard-Compliant Vehicles, and the users of those vehicles to conduct mobile communications that implement the LTE mobile communications standards.

42. Upon information and belief, the PACCAR Standard-Compliant Vehicles that are LTE-compliant include a TCU2 NA IP30 or TCU2 NA IP67, TRUCKTECH+, SMARTLINQ, PACCAR Solutions, PACCAR Connect, or Remote Diagnostics LTE module. The Model Medium Duty Driver Operator Manual provided on Peterbilt's website establishes the Telematics Control

Unit (TCU) used in the models stated above. This is reflected in the screenshot below taken directly from the manual.[10]

## Telematics Control Unit
## FCC Information

### General Information

| Model | IC |
|---|---|
| TCU2 NA IP30 | 2AUXS-TCU2NAIP30 |
| TCU2 NA IP67 | 2AUXS-TCU2NAIP67 |

43.    Upon information and belief, the PACCAR Standard-Compliant Vehicles are capable of communicating via cellular networks. For example, the TCU2 models used in the PACCAR Standard-Compliant Vehicles feature 4G cellular connectivity and a 4G LTE cellular interface. The TCD Technical Customer Documentation displays the specifications and layout of the TCU2 product, including the 4G connectivity capabilities as shown in the screenshots below taken directly from the TCD.[11] Furthermore, an image of the TCU2 NA IP30 is below.[12]

On the other hand, TCU2 features 4G Cellular Connectivity to connect to cloud services, Bluetooth & WLAN to connect to end-customer devices (like Tablets, Smart Phones), as well as GNSS, to determine the position of the vehicle.
TCU2 can manage all kinds of data transfer (for example, Vehicle Data to Cloud, 4G to WLAN Hotspot, Vehicle Data to end-customer tablet) and is prepared that applications can be deployed by 3rd parties.

---

[10] https://www.peterbilt.com/static-assets/documents/resources/Y53-6113-1B1.pdf (last visited June 24, 2025).

[11] https://fccid.io/2AUXS-TCU2NAIP67A/User-Manual/Users-Manual-7327416.pdf (last visited June 24, 2025).

[12] https://fcc.report/FCC-ID/2AUXS-TCU2NAIP30/7233071.pdf (last visited June 24, 2025).

## PACCAR
**TCU2**

<u>Wireless Interfaces:</u>

• 4G LTE Cellular Interface



In another example, the PACCAR Standard-Compliant Vehicles using TRUCKTECH+, SMARTLINQ, PACCAR Solutions, PACCAR Connect, or Remote Diagnostics are dependent

upon wireless telecommunications technology. The PACCAR Telematics Terms display the cellular connectivity dependency of all of PACCAR's Truck Connectivity Services. A screenshot taken from the Telematics Terms is shown below.[13]

Welcome to **Truck Connectivity Services** ("TRUCKTECH+", "SMARTLINQ", "PACCAR Solutions", "PACCAR Connect," "Remote Diagnostics," and "data collection through telematics") (referred to herein as the "**Service**" or "**Services**"), a suite of connected vehicle services. These Terms and Conditions (this "**Agreement**") apply to the data connectivity of your vehicle and your use of any of the Subscriptions provided by PACCAR (defined below). You can access the Services by enrollment in a subscription ("**Subscription**"). Please see your dealer or visit PACCARSolutions.com for specific details regarding the Services available in the vehicle you have purchased or leased. The Services and any Subscription are governed by this Agreement.

B. **Termination of Wireless Networks.** The System functions using digital wireless telecommunications technology dependent on a wireless network, each of which is outside of our control. If the wireless carrier ceases to support the network with which the System in your Vehicle is compatible either partially or completely, your ability to receive the Services will be reduced or terminated, respectively. PACCAR is not responsible for providing you continued access to the Services considering cellular network limitation or termination, nor any associated costs. Should the compatible network terminate, we may cancel your service and issue a prorated refund for any remaining unused time in your Subscription that you have paid in advance, if applicable. If that happens, we will notify you of the effective date of cancellation.

## FIRST CAUSE OF ACTION

### (Infringement of the '740 Patent)

44.    L2MT hereby repeats and re-alleges the allegations contained in paragraphs 1 to 43, as if fully set forth herein.

45.    It is necessary to practice one or more claims of the '740 patent to comply with the requirements of the LTE mobile communications standard, including without limitation 3GPP TS 36.331 v8.21.0, 36.321 v8.12.0, and 36.213 v8.8.0, and subsequent versions. The PACCAR

---

[13] https://www.paccar.com/telematicsterms (last visited June 24, 2025).

Standard-Compliant Vehicles are covered by one or more claims of the '740 patent and therefore infringe the '740 patent. A claim chart attached as Exhibit 4 identifies specifically how each element of each asserted claim of the '740 patent must be practiced by devices, such as the PACCAR Standard-Compliant Vehicles, that comply with the LTE wireless communications standard.

46.     PACCAR, directly and/or through its subsidiaries, affiliates, agents, and/or business partners, has in the past and continues to directly infringe the '740 patent, including at least claim 1, pursuant to 35 U.S.C. § 271(a) by making, using, offering to sell, and/or selling in the United States, and/or importing into the United States, without authority, products, including without limitation the PACCAR Standard-Compliant Vehicles, that are covered by or practice the inventions claimed in the '740 patent. Furthermore, upon information and belief, PACCAR makes and sells the PACCAR Standard-Compliant Vehicles outside of the United States, delivers those products to customers, distributors, and/or subsidiaries in the United States, or in the case that PACCAR delivers the PACCAR Standard-Compliant Vehicles outside of the United States, it does so intending and/or knowing that those products are destined for the United States and/or designs those products for sale in the United States, thereby directly infringing the '740 patent.

47.     PACCAR, directly and/or through its subsidiaries, affiliates, agents, and/or business partners, has in the past and continues to directly infringe the '740 patent, including at least claim 1, pursuant to 35 U.S.C. § 271(a) by making, using, offering to sell, and/or selling in the United States, and/or importing into the United States, without authority, products, including without limitation the PACCAR Standard-Compliant Vehicles, that are covered by or practice the inventions claimed in the '740 patent. Each of the PACCAR Standard-Compliant Vehicles includes hardware and software components that together practice every element of one or more

claims of the '740 patent. Those components include the hardware and software components that enable the set of wireless communications functionalities known as LTE in compliance with the requirements of the technical standards applicable to mobile communications, including the technical standards promulgated by 3GPP and various subsequent releases and versions thereof. These components enable the PACCAR Standard-Compliant Vehicles to communicate using the LTE wireless communications standards.

48.     It is necessary to practice one or more of the claims of the '740 patent to comply with the requirements of certain standards applicable to LTE mobile communications. It is necessary for PACCAR to infringe, for example, claim 1 of the '740 patent literally and/or pursuant to the doctrine of equivalents wherein such products practice the method for handling a Transmission Time Interval (TTI) bundling mode in a user equipment (UE) of a wireless communication system, the method comprising: switching an operation status of the TTI bundling mode by deactivating the TTI bundling mode; and flushing all uplink Hybrid Automatic Repeat Request (HARQ) buffers in the UE when the TTI bundling mode is deactivated. Upon information and belief, PACCAR's use of the PACCAR Standard-Compliant Vehicles includes quality control testing of such products. PACCAR is infringing claim 1 of the '740 patent as set forth in the claim charts attached as Exhibit 4.

49.     PACCAR, directly and/or through its subsidiaries, affiliates, agents, and/or business partners, has in the past and continues to indirectly infringe the '740 patent, including at least claim 1 of the '740 patent, pursuant to 35 U.S.C. § 271(b) by actively inducing acts of direct infringement performed by others. PACCAR has had actual notice of the '740 patent and the infringement alleged herein at least as early as October 6, 2020, when L2MT identified the '740

patent as one of the patents owned by L2MT that read on the LTE wireless communications standard.

50.    Upon gaining knowledge of the '740 patent, it was, or became, apparent to PACCAR that the making, using, offering to sell, and/or selling in the United States, and/or importing into the United States the devices that comply with the LTE wireless communications standard results in infringement of the '740 patent. Instead of taking a FRAND license to the L2MT Essential Patents, including the '740 patent, PACCAR has continued and will continue to engage in activities constituting inducement of infringement, notwithstanding its knowledge, or willful blindness thereto, that the activities it induces result in infringement of the '740 patent.

51.    The PACCAR Standard-Essential Vehicles are intended for distribution and sale into the United States. PACCAR manufactures the PACCAR Standard-Essential Vehicles and/or has such devices manufactured on its behalf, which devices infringe when they are imported into, or sold, used, or offered for sale in, the United States. PACCAR indirectly infringes by inducing customers (such as third-party manufacturers, resellers, third-party distributors, wireless service providers, and end-users) to infringe the methods claimed in the '740 patent by making, using, selling, offering for sale, in the United States, or by importing into the United States, such products. For example, PACCAR actively induces third parties, including without limitation end-users of PACCAR Standard-Compliant Vehicles, to infringe the '740 patent by, among other things, (i) designing, manufacturing, offering for sale, and selling the PACCAR Standard-Compliant Vehicles to end-users or to others who offer for sale or sell the same to end-users with the knowledge and intent that end-users will use the devices in accordance with the LTE standard; (ii) enabling a user of PACCAR Standard-Compliant Vehicles to use the products in accordance with at least the LTE standard as disclosed and claimed in the '740 patent; (iii) providing instructions

to end-users of PACCAR Standard-Compliant Vehicles for using the PACCAR Standard-Compliant Vehicles in their customary way; (iv) providing cellular connectivity, remote diagnosis, and important firmware updates over cellular networks; (v) enabling users to monitor and control their PACCAR Standard-Compliant Vehicles over cellular networks using the PACCAR App; (vi) sending notifications for events (such as vehicle charting status) and enabling customers to receive notifications over cellular networks; (vii) advertising compliance with at least the LTE standard; and (viii) providing to third parties the hardware (e.g., antenna(s), filter(s), switch(es), transceiver(s), and/or baseband processor(s) contained in PACCAR Standard-Compliant Vehicles) and software components (e.g., operating systems running on PACCAR Standard-Compliant Vehicles and other software and/or firmware used to operate components of the PACCAR Standard-Compliant Vehicles) that may be required for or associated with infringement of one or more claims of the '740 patent via the manufacture, marketing, sale, and/or distribution of PACCAR Standard-Compliant Vehicles through PACCAR's website and sales locations.

52.    PACCAR intends for the PACCAR Standard-Compliant Vehicles to be imported, offered for sale, sold, and used in the United States by third-party distributors, wireless service providers, and end-users by at least creating advertisements that promote the infringing use of the PACCAR Standard-Compliant Vehicles, creating and/or maintaining established distribution channels for the PACCAR Standard-Compliant Vehicles into and within the United States, manufacturing the PACCAR Standard-Compliant Vehicles in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to end-users in the United States, and/or providing technical support, replacement parts, or services for the PACCAR Standard-Compliant Vehicles to end-users in the United States.

53.    PACCAR encourages third-party distributors, wireless service providers, and end-users to infringe the methods claimed in the '740 patent with knowledge and the specific intent to cause the acts of direct infringement performed by these third parties. On information and belief, despite having knowledge of the '740 patent, PACCAR has been and will continue to import and sell the PACCAR Standard-Compliant Vehicles in large volumes directly and through the actions of others controlled by PACCAR. PACCAR is aware that the PACCAR Standard-Compliant Vehicles are manufactured to comply with the LTE wireless communications standard, and that subsequent importation, sale and use of such products in the United States would be a direct infringement of the '740 patent. Therefore, PACCAR is aware that its third-party distributors, wireless service providers, and end-users will infringe the '740 patent by importing, selling and using the products supplied by PACCAR.

54.    PACCAR directly benefits from and actively and knowingly encourages the importation into the United States of the PACCAR Standard-Compliant Vehicles by third-party manufacturers, third-party distributors, wireless service providers, and end-users into the United States and sale and use within the United States. PACCAR actively encourages third-party distributors, wireless service providers, and end-users to import, use, and sell in the United States the PACCAR Standard-Compliant Vehicles that it manufactures and supplies, including through advertising, marketing and sales activities directed at United States sales. On information and belief, PACCAR is aware of the size and importance of the United States market for customers of the PACCAR Standard-Compliant Vehicles, and also distributes or supplies these products intended for importation, use, and sale in the United States. PACCAR has numerous direct sellers, resellers, and distributors, such as wireless service providers, for these products in the United

States. PACCAR's marketing efforts show that it has specifically intended to and has induced direct infringement in the United States.

55.    PACCAR has engaged and will continue to engage in additional activities to specifically target the United States market for the PACCAR Standard-Compliant Vehicles and actively induces customers, distributors, wireless service providers, and end-users to directly infringe one or more claims of the '740 patent in the United States. For example, PACCAR has showcased its PACCAR Standard-Compliant Vehicles at various industry events and through written materials distributed in the United States, in an effort to encourage end-users to use, sell, offer for sale, or import into the United States the PACCAR Standard-Compliant Vehicles. These events are attended by the direct infringers mentioned above.

56.    PACCAR's extensive sales and marketing efforts, sales volume, and partnerships all evidence its intent to induce others to directly infringe one or more claims of the '740 patent by using, offering to sell, selling, and/or importing the PACCAR Standard-Compliant Vehicles in the United States. PACCAR has had specific intent to induce infringement or has been willfully blind to the direct infringement it is inducing.

57.    PACCAR's direct and indirect infringement of the '740 patent has injured L2MT, and L2MT is entitled to recover damages adequate to compensate for such infringement pursuant to 35 U.S.C. § 284. Unless it ceases its infringing activities, PACCAR will continue to injure L2MT by infringing the '740 patent.

58.    On information and belief, PACCAR acted egregiously and with willful misconduct in that its actions constituted direct or indirect infringement of a valid patent, and this was either known or so obvious that PACCAR should have known about it. PACCAR continues to infringe the '740 patent by making, using, selling, offering for sale and/or importing into the

United States the PACCAR Standard-Compliant Vehicles and to induce direct infringement by others performing these acts, or they have acted at least in reckless disregard of L2MT's patent rights. PACCAR has continued its infringement notwithstanding actual knowledge of the '740 patent and without a good faith basis to believe that its activities do not infringe any valid claim of the '740 patent. PACCAR's infringement of the '740 patent following its knowledge of the '740 patent is willful and L2MT is entitled to treble damages and attorneys' fees and costs incurred in this action under 35 U.S.C. §§ 284 and 285.

## SECOND CAUSE OF ACTION

### (Infringement of the '784 Patent)

59.     L2MT hereby repeats and re-alleges the allegations contained in paragraphs 1 to 58, as if fully set forth herein.

60.     It is necessary to practice one or more claims of the '784 patent to comply with the requirements of the LTE mobile communications standard, including without limitation 3GPP TS 36.331 v8.21.0, 36.321 v8.12.0, 36.213 v8.8.0, and subsequent versions. The PACCAR Standard-Compliant Vehicles are covered by one or more claims of the '784 patent and therefore infringe the '784 patent. A claim chart attached as Exhibit 5 identifies specifically how each element of each asserted claim of the '784 patent must be practiced by devices, such as the PACCAR Standard-Compliant Vehicles, that comply with the LTE wireless communications standard.

61.     PACCAR, directly and/or through its subsidiaries, affiliates, agents, and/or business partners, has in the past and continues to directly infringe the '784 patent, including at least claim 1, pursuant to 35 U.S.C. § 271(a) by making, using, offering to sell, and/or selling in the United States, and/or importing into the United States, without authority, products, including without limitation the PACCAR Standard-Compliant Vehicles, that are covered by or practice

the inventions claimed in the '784 patent. Furthermore, upon information and belief, PACCAR makes and sells the PACCAR Standard-Compliant Vehicles outside of the United States, delivers those products to customers, distributors, and/or subsidiaries in the United States, or in the case that PACCAR delivers the PACCAR Standard-Compliant Vehicles outside of the United States, it does so intending and/or knowing that those products are destined for the United States and/or designs those products for sale in the United States, thereby directly infringing the '784 patent.

62.    PACCAR, directly and/or through its subsidiaries, affiliates, agents, and/or business partners, has in the past and continues to directly infringe the '784 patent, including at least claim 1, pursuant to 35 U.S.C. § 271(a) by making, using, offering to sell, and/or selling in the United States, and/or importing into the United States, without authority, products, including without limitation the PACCAR Standard-Compliant Vehicles, that are covered by or practice the inventions claimed in the '784 patent. Each of the PACCAR Standard-Compliant Vehicles includes hardware and software components that together practice every element of one or more claims of the '784 patent. Those components include the hardware and software components that enable the set of wireless communications functionalities known as LTE in compliance with the requirements of the technical standards applicable to mobile communications, including the technical standards promulgated by 3GPP and various subsequent releases and versions thereof. These components enable the PACCAR Standard-Compliant Vehicles to communicate using the LTE wireless communications standards.

63.    It is necessary to practice one or more of the claims of the '784 patent to comply with the requirements of certain standards applicable to LTE mobile communications. It is necessary for PACCAR to infringe, for example, claim 1 of the '784 patent literally and/or

pursuant to the doctrine of equivalents wherein such products practice the method for handling retransmission of a Transmission Time Interval (TTI) bundle in a user equipment (UE) of a wireless communication system, the UE operating in a TTI bundling mode, a first transmission of the TTI bundle being generated according to an uplink grant received on a Physical Downlink Control Channel (PDCCH), follow-up transmissions of the TTI bundle being generated in a non-adaptive retransmission way, the method comprising: performing a bundle retransmission of the TTI bundle, the bundle retransmission being triggered by a Hybrid Automatic Retransmission Request (HARQ) process responsible for the TTI bundle; determining whether to generate a non-adaptive retransmission for a current transmission opportunity according to a last received feedback of this HARQ process no matter whether the current transmission opportunity is a first transmission opportunity of the bundle retransmission or a transmission opportunity within the bundle retransmission when no uplink grant for the current transmission opportunity has been received on the PDCCH; generating the non-adaptive retransmission for the current transmission opportunity if the last received feedback of this HARQ process is a non-acknowledgement signal; and not generating the non-adaptive retransmission for the current opportunity if the last received feedback of this HARQ process is an acknowledgement signal. Upon information and belief, PACCAR's use of the PACCAR Standard-Compliant Vehicles includes quality control testing of such products. PACCAR is infringing at least claim 1 of the '784 patent as set forth in the claim charts attached as Exhibit 5.

64.    PACCAR, directly and/or through its subsidiaries, affiliates, agents, and/or business partners, has in the past and continues to indirectly infringe the '784 patent, including at least claim 1 of the '784 patent, pursuant to 35 U.S.C. § 271(b) by actively inducing acts of direct infringement performed by others. PACCAR has had actual notice of the '784 patent and

the infringement alleged herein at least as early as January 2022, when L2MT identified the '784 patent as one of the patents owned by L2MT that read on the LTE wireless communications standard.

65.     Upon gaining knowledge of the '784 patent, it was, or became, apparent to PACCAR that the making, using, offering to sell, and/or selling in the United States, and/or importing into the United States the devices that comply with the LTE wireless communications standard results in infringement of the '784 patent. Instead of taking a FRAND license to the L2MT Essential Patents, including the '784 patent, PACCAR has continued and will continue to engage in activities constituting inducement of infringement, notwithstanding its knowledge, or willful blindness thereto, that the activities it induces result in infringement of the '784 patent.

66.     The PACCAR Standard-Essential Vehicles are intended for distribution and sale into the United States. PACCAR manufactures the PACCAR Standard-Essential Vehicles and/or has such devices manufactured on its behalf, which devices infringe when they are imported into, or sold, used, or offered for sale in, the United States. PACCAR indirectly infringes by inducing customers (such as third-party manufacturers, resellers, third-party distributors, wireless service providers, and end-users) to infringe the methods claimed in the '784 patent by making, using, selling, offering for sale, in the United States, or by importing into the United States, such products. For example, PACCAR actively induces third parties, including without limitation end-users of PACCAR Standard-Compliant Vehicles, to infringe the '784 patent by, among other things, (i) designing, manufacturing, offering for sale, and selling the PACCAR Standard-Compliant Vehicles to end-users or to others who offer for sale or sell the same to end-users with the knowledge and intent that end-users will use the devices in accordance with the LTE standard; (ii) enabling a user of PACCAR Standard-Compliant Vehicles to use the products

in accordance with at least the LTE standard as disclosed and claimed in the '784 patent; (iii) providing instructions to end-users of PACCAR Standard-Compliant Vehicles for using the PACCAR Standard-Compliant Vehicles in their customary way; (iv) providing cellular connectivity, remote diagnosis, and important firmware updates over cellular networks; (v) enabling users to monitor and control their PACCAR Standard-Compliant Vehicles over cellular networks using the PACCAR App; (vi) sending notifications for events (such as vehicle charting status) and enabling customers to receive notifications over cellular networks; (vii) advertising compliance with at least the LTE standard; and (viii) providing to third parties the hardware (e.g., antenna(s), filter(s), switch(es), transceiver(s), and/or baseband processor(s) contained in PACCAR Standard-Compliant Vehicles) and software components (e.g., operating systems running on PACCAR Standard-Compliant Vehicles and other software and/or firmware used to operate components of the PACCAR Standard-Compliant Vehicles) that may be required for or associated with infringement of the '784 patent's claims via the manufacture, marketing, sale, and/or distribution of PACCAR Standard-Compliant Vehicles through PACCAR's website and sales locations.

67. PACCAR intends for the PACCAR Standard-Compliant Vehicles to be imported, offered for sale, sold, and used in the United States by third-party distributors, wireless service providers, and end-users by at least creating advertisements that promote the infringing use of the PACCAR Standard-Compliant Vehicles, creating and/or maintaining established distribution channels for the PACCAR Standard-Compliant Vehicles into and within the United States, manufacturing the PACCAR Standard-Compliant Vehicles in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to end-

users in the United States, and/or providing technical support, replacement parts, or services for the PACCAR Standard-Compliant Vehicles to end-users in the United States.

68.    PACCAR encourages third-party distributors, wireless service providers, and end-users to infringe the methods claimed in the '784 patent with knowledge and the specific intent to cause the acts of direct infringement performed by these third parties. On information and belief, despite having knowledge of the '784 patent, PACCAR has been and will continue to import and sell the PACCAR Standard-Compliant Vehicles in large volumes directly and through the actions of others controlled by PACCAR. PACCAR is aware that the PACCAR Standard-Compliant Vehicles are manufactured to comply with the LTE wireless communications standard, and that subsequent importation, sale and use of such products in the United States would be a direct infringement of the '784 patent. Therefore, PACCAR is aware that its third-party distributors, wireless service providers, and end-users will infringe the '784 patent by importing, selling and using the products supplied by PACCAR.

69.    PACCAR directly benefits from and actively and knowingly encourages the importation into the United States of the PACCAR Standard-Compliant Vehicles by third-party manufacturers, third-party distributors, wireless service providers, and end-users into the United States and sale and use within the United States. PACCAR actively encourages third-party distributors, wireless service providers, and end-users to import, use, and sell in the United States the PACCAR Standard-Compliant Vehicles that it manufactures and supplies, including through advertising, marketing, and sales activities directed at United States sales. On information and belief, PACCAR is aware of the size and importance of the United States market for customers of the PACCAR Standard-Compliant Vehicles, and also distributes or supplies these products intended for importation, use, and sale in the United States. PACCAR has numerous direct

sellers, resellers, and distributors, such as wireless service providers, for these products in the United States. PACCAR's marketing efforts show that it has specifically intended to and has induced direct infringement in the United States.

70.     PACCAR has engaged and will continue to engage in additional activities to specifically target the United States market for the PACCAR Standard-Compliant Vehicles and actively induces customers, distributors, wireless service providers, and end-users to directly infringe one or more claims of the '784 patent in the United States. For example, PACCAR has showcased its PACCAR Standard-Compliant Vehicles at various industry events and through written materials distributed in the United States, in an effort to encourage end-users to use, sell, offer for sale, or import into the United States the PACCAR Standard-Compliant Vehicles. These events are attended by the direct infringers mentioned above.

71.     PACCAR's extensive sales and marketing efforts, sales volume, and partnerships all evidence its intent to induce others to directly infringe one or more claims of the '784 patent by using, offering to sell, selling, and/or importing the PACCAR Standard-Compliant Vehicles in the United States. PACCAR has had specific intent to induce infringement or has been willfully blind to the direct infringement it is inducing.

72.     PACCAR's direct and indirect infringement of the '784 patent has injured L2MT, and L2MT is entitled to recover damages adequate to compensate for such infringement pursuant to 35 U.S.C. § 284. Unless it ceases its infringing activities, PACCAR will continue to injure L2MT by infringing the '784 patent.

73.     On information and belief, PACCAR acted egregiously and with willful misconduct in that its actions constituted direct or indirect infringement of a valid patent, and this was either known or so obvious that PACCAR should have known about it. PACCAR

continues to infringe the '784 patent by making, using, selling, offering for sale and/or importing into the United States the PACCAR Standard-Compliant Vehicles and to induce direct infringement by others performing these acts, or they have acted at least in reckless disregard of L2MT's patent rights. PACCAR has continued its infringement notwithstanding actual knowledge of the '784 patent and without a good faith basis to believe that its activities do not infringe any valid claim of the '784 patent. PACCAR's infringement of the '784 patent following its knowledge of the '784 patent is willful and L2MT is entitled to treble damages and attorneys' fees and costs incurred in this action under 35 U.S.C. §§ 284 and 285.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

1.    Judgment that the Patents in Suit are each valid and enforceable;

2.    Judgment that the Patents in Suit are each infringed by PACCAR;

3.    Judgment that PACCAR's acts of patent infringement relating to the Patents in Suit are willful;

4.    An award of damages arising out of PACCAR's acts of patent infringement, together with pre-judgment and post-judgment interest;

5.    Judgment that the damages so adjudged be trebled in accordance with 35 U.S.C. § 284;

6.    An award of L2MT's attorneys' fees, costs and expenses incurred in this action in accordance with 35 U.S.C. § 285; and

7.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands trial by jury of all issues triable of right by a jury.

## <u>RESERVATION OF RIGHTS</u>

L2MT's investigation is ongoing, and certain material information remains in the sole possession of PACCAR or third parties, which will be obtained via discovery herein. L2MT expressly reserves the right to amend or supplement the causes of action set forth herein in accordance with Rule 15 of the Federal Rules of Civil Procedure.

<br>

                                             Respectfully submitted,

Date:   July 11, 2025             /s/Jon A. Birmingham_____

                                             Jon A. Birmingham (CA 271034)
FITCH, EVEN, TABIN & FLANNERY LLP
1150 Laurel Lane, Suite 180
San Luis Obispo, CA 93401
Tel: (818) 650-1392
Fax: (312) 577-7007
jbirmi@fitcheven.com

Christopher W. Paulson (IL 6349561)
FITCH, EVEN, TABIN & FLANNERY LLP
120 South LaSalle Street, Suite 2100
Chicago, Illinois 60603
Telephone: (312) 577-7000
Facsimile: (312) 577-7007
cpaulson@fitcheven.com

*Counsel for Plaintiff*